UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. | ) | |
| NATALIE RAVEN and | ) | |
| CHRISTY CURTIS, | ) | Civil Action No. |
| | ) | 1-11-CV-0994-CAP |
| Plaintiffs-Relators, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGIA CANCER SPECIALISTS I, | ) | |
| P.C., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BRIEF IN SUPPORT OF RELATORS' MOTION TO COMPEL
RESPONSE TO INTERROGATORY NO. 8 AND REQUEST FOR
PRODUCTION NO. 14 TO DEFENDANT GEORGIA CANCER
SPECIALISTS I, P.C.**

Plaintiffs-Relators Natalie Raven and Christy Curtis ("Relators") hereby

move to require Defendant Georgia Cancer Specialists I, P.C. ("GCS") to provide a

full and complete response to Interrogatory No. 8 of Relators' First Interrogatories

and Request No. 14 of Relators' First Request for Production of Documents, and in

support thereof show the Court as follows.[1]

_____

[1] Relators' interrogatories and document requests are attached hereto as Exhibits 1
and 2.  GCS's responses are attached as Exhibits 3 and 4.  GCS has served
supplemental responses to interrogatories, but not with respect to Interrogatory No.

1.    **Factual background.**

At issue in this case are two consecutive arrangements under which entities provided homecare coordination services to GCS: (i) an arrangement between GCS and Option Care HME, Inc. ("Option Care"), which lasted until February 2008, and (ii) an arrangement between GCS and Amedisys Georgia, Inc. ("Amedisys"), which lasted from March 2008 until May 2012.  Relators contend that the arrangements violated the Stark Law and the Anti-Kickback Statute, and that claims submitted by Option Care and Amedisys pursuant to referrals from GCS thus constitute false claims.  Relators contend that GCS is liable under the False Claims Act for causing the submission of such false claims.

a.    **The Option Care arrangement: 1999-2008.**

GCS is a large physician practice with dozens of different offices.  Many of GCS's patients require home health services, including nursing, physical, occupational, or speech therapy, durable medical equipment ("DME"), infusion therapy, and respiratory therapy.  Other patients require institutional treatment, including hospice care and nursing home care.  In 1999, Option Care and GCS entered into an arrangement where Option Care provided a dedicated employee whose sole job was to coordinate the provision of such services for GCS patients.

---

8.  On March 7, 2017, counsel for GCS notified Relators' counsel that GCS stood by its response to Interrogatory No. 8 and would not provide a further response.

Under this arrangement, if a GCS patient required home health or institutional services, GCS would refer the patient to Option Care, which would match the patient up with the appropriate provider or providers and arrange for the provision of the services ordered by GCS.  Option Care would coordinate the provision of such services regardless of whether it provided such services itself or referred the patient to another provider.  *See* Exhibit 5 (Lenz Dep., p. 64-68).

In addition to these coordination services, Option Care agreed to make its nurses available around the clock to take calls from GCS patients receiving home infusion who had questions or difficulties with regard to the operation of home infusion pumps ("pump call" services).  *Id.*, p. 127-128.

From 1999 through the end of 2002, Option Care provided such services without a written agreement and without being paid by GCS.  Lenz Dep., p. 65-66, 132.  In 2003, Option Care and GCS entered into two written agreements, both of which purport to be effective of January 1, 2003: (i) a First Term Agreement on Coordination of Home Care, Institutional Therapy and Other Services ("First Term Agreement"), and (ii) an Agreement on Coordination of Home Care, Institutional Therapy and Other Services (the "Coordination Agreement").  Each agreement was signed by Dr. Wendy Hawke Lenz on behalf of GCS, and by Phillip Stone on behalf of Option Care.  *See* Exhibits 6, 7; Lenz Dep., p. 89.

In the First Term Agreement, the parties noted that Option Care had provided coordination services for GCS from 1999 through 2012, and purported to settle amounts due from one party to the other with respect to such past services. The agreement purported to value the homecare coordination services provided by Option Care at $933.80 per month.  However, the agreement provided for an offset of nearly all of this amount, retroactively charging Option Care for access to GCS resources it used to perform the coordination services ($335 per month for alleged use of GCS's premises, $150 per month for access to its computer hardware, fax, and copier, $330 per month for access to its phone lines, and $150 for access to its computer software).  After these offsets, the total amount Option Care was to be paid (retroactively) for coordination services averaged less than $200 per month. Exhibit 6, p. 3.

The First Term Agreement also provided that GCS would retroactively pay Option Care a total of $1,840 for pump call services provided from November 2000 through December 2002.  The agreement did not pay Option Care anything for making its nurses available to take call, but simply paid $20 for each call actually taken.  *Id*.; Lenz Dep., p. 129 ("They were not paid by GCS for being on call.").

The Coordination Agreement purported to govern the parties' relationship going forward from January 1, 2003. Exhibit 7; *see* Lenz Dep., p. 90, 136. The agreement required Option Care to provide two types of coordination services for GCS: (i) coordination of "core" home care services, which Option Care supposedly (but not actually) provided free of charge to all referral sources, and (ii) coordination of "non-core" home care services and institutional and therapy services. Exhibit 7, §§ 1.1, 1.2. Under the agreement, Option Care was to be paid nothing for coordination of "core" home care services. With respect to coordination of "non-core" home care services and institutional and therapy services, Option Care was to be paid the lesser of $12.50 per referral or $1,334 per month. *Id.* Thus, if Option Care coordinated 107 outside referrals in a month, it would receive a total of $1,334; if it coordinated 250 outside referrals in a month, it would receive no additional compensation for the additional 143 referrals. Moreover, Option Care agreed to pay GCS $150 per month for access to GCS's computer system, which it needed to access to provide the coordination services – thus, the net amount Option Care was to be paid for coordination services was only $1,184 per month. *Id.*, § III.

In addition, Option Care agreed to provide pump call services from 5:00 p.m. until 8:30 a.m., Monday through Thursday. Option Care was to be paid

nothing for being on-call for 15.5 hours a night, but was only to paid $20 for each call actually received, up to a maximum of $40 per night.  *Id.*, § II.

**b.      The Amedisys arrangement: 2008-2012.**

In early 2008, Option Care terminated the coordination arrangement, and GCS had to scramble to find someone to take over the coordination services.  Lenz Dep., p. 176-177.  In March 2008, Amedisys began providing homecare coordination services for GCS, taking over for Option Care.  *Id.*, p. 181.  In April 2008, GCS entered into an Administrative Services Agreement with Amedisys, under which Amedisys agreed to "provide a part-time Intake Clinical Manager … to GCS to coordinate Home Care Services for GCS patients."  *See* Exhibit 8, § 1. This contract defined "Home Care Services" as "the establishment of home health care, IV therapy, and durable medical equipment for patients not receiving home health care from Amedisys."  *Id.*  (Amedisys also provided coordination services for patients for whom Amedisys provided the home health services, but was not paid for this.  *See* Lenz Dep., p. 240.)  The contract stated that:

> GCS hereby covenants and represents that coordination of Home Care Services requires only a part-time employee working one-fifth of his/her time, and in the event GCS were to attempt to staff this position internally, it would employ a part-time LPN or RN at a pay rate of not more than $800.00 per month for such service(s).

Exhibit 8, § 3(a).   Based on this representation, GCS agreed to pay Amedisys "a monthly fee in the amount of one-fifth (1/5) of the Intake Clinical Manager's total compensation," which was estimated to be about $800 per month.  *Id*., § 3.  This agreement was signed by Dr. Wendy Hawke Lenz on behalf of GCS.  *Id*., p. 6; Lenz Dep., p. 195.

Although the agreement provided for GCS to pay Amedisys quarterly for the coordination services provided by Amedisys, GCS did not actually make any payments until December 2009 – **twenty months** after the contract was executed.  *See* Exhibit 9; Lenz Dep., p. 216-217.  After making some more payments throughout 2010, GCS did not make any payments from February 2011 until the contract was terminated in May 2012.  *Id*., p. 224-225; Exhibit 9.  Thus, in the course of an arrangement that lasted about four years, GCS **twice** went more than a year without making any payments whatsoever, all the while knowing that Amedisys was performing coordination services on its behalf.  Lenz Dep., p. 218.  Indeed, during the four-year arrangement, there was only a 14-month period of time during which GCS actually made payments.

On May 9, 2012, more than a year after this case was filed, Amedisys made a self-disclosure to the Centers for Medicare and Medicaid Services ("CMS") regarding a potential Stark Law violation with respect to the GCS arrangement.

*See* Exhibit 10.  In this self-disclosure, Amedisys notified CMS that its home health coordinators in fact spent far more than 20% of their time providing coordination services to GCS.  Amedisys advised CMS that its initial coordinator, Susan Parker, spent 100% her time providing coordination services for GCS, and that her replacement, Sharon Bivins, spent 84% of her time providing such services for GCS.  Amedisys advised CMS that, based on its review of records maintained under the contract, "approximately 54% of the care coordination work performed by the Intake Clinical Managers handling GCS patients was performed with respect to patients who were referred to home health providers other than Amedisys, and the remaining approximately 46% of the work was performed with respect to Amedisys patients."  *Id*., p. 4.

Amedisys advised CMS that the homecare coordination arrangement created a financial relationship under the Stark Law between Amedisys and the GCS physicians.  *Id*., p. 5.  Because there was a financial relationship, the GCS physicians were prohibited from making referrals to Amedisys for home health services, and Amedisys was prohibited from submitting claims to Medicare for such services, unless the arrangement met the strict terms of an exception under the Stark Law.  *See* 42 U.S.C. §1395nn.  Because the Amedisys coordinators spent far more than 20% of their time providing services for GCS under the agreement,

Amedisys advised CMS that "the compensation contracted for and paid may have been less than fair market value for the services actually provided by Amedisys Georgia," meaning that the arrangement would not comply with an exception under the Stark Law.   Exhibit 10, p. 6.

2.   **Interrogatory No. 8.**

Interrogatory 8 stated as follows:

With respect to each Arrangement described in Request No. 1 of Relators' First RPD, please state whether you contend that, during the existence of such Arrangement, you had a good faith belief that the Arrangement complied with the Stark Law or the Anti-Kickback Statute, and if so, state the factual basis for such belief, including (i) whether such belief was based in whole or in part on the advice of, or communications with, any counsel, consultant, or other adviser, (ii) whether you sought or received any advice or opinions from any counsel, consultant, or other adviser with respect to such compliance, and (iii) identifying any such counsel, consultant, or adviser.

Exhibit 1, p. 6.  In response, GCS stated as follows: "GCS incorporates its Response and Objections to Interrogatory No. 7 by reference as if stated *verbatim* herein. GCS further states that it is not relying on an advice of counsel defense."

Exhibit 3, p. 15.  Its response to Interrogatory No. 7 was as follows:

GCS objects to Interrogatory No. 7 on the grounds that it seeks information protected by the attorney/client privilege and/or work product doctrine. GCS further objects on the grounds that the Interrogatory calls for a legal conclusion. GCS declares that it has not had a full and fair opportunity to investigate the facts of this case and to develop its defense. As a result, GCS reserves the right to amend its response accordingly. Subject to the foregoing objections and without waiving the same, GCS responds that the

9

> payments made by GCS to Option Care/AHS and/or Amedysis were determined in good faith, based on historical data, and constitute fair and general market value for any services provided. These payments and services were set in advance in writing, and were negotiated at arm's length. GCS incorporates by reference its response to Interrogatory No. 1 and 2 as well as the documents being produced contemporaneously herewith as further evidence of the factual basis for GCS' defense. GCS intends to rely on 42 U.S.C. § 1395nn(e)(3)(A); (e)(8); and (h)(3); as well as 42 C.F.R. § 411.351.

*Id.*, p. 14. On March 7, 2017, GCS informed Relators that it stood by its response to Interrogatory No. 8, and would not be providing further supplementation.

GCS's response is completely non-responsive, in that it does not in any way answer the interrogatory. Relators did not ask whether GCS was "relying on an advice of counsel defense," but asked "whether you contend that, during the existence of such Arrangement, you had a good faith belief that the Arrangement complied with the Stark Law or the Anti-Kickback Statute." GCS does not provide either a "yes" or a "no" answer to this question.

Relators are certainly entitled to know what GCS's contentions are in this lawsuit, particularly on an issue as important as whether it believed the arrangements with Option Care and Amedisys complied with the Stark Law and AKS. *See Bohannon v. Honda Motor Co.*, 127 F.R.D. 536, 538 (D. Kan. 1989) ("An interrogatory may properly inquire into a party's contentions in the case."); Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it

asks for an opinion or contention that relates to fact or the application of law to fact"). The False Claims Act imposes liability on persons who "knowingly" cause false claims to be submitted, and the term "knowingly" is defined to include situations where the person acts with "deliberate ignorance" or "reckless disregard." 31 U.S.C. § 3729. If GCS does **not** contend that it believed the arrangements with Option Care and Amedisys complied with the Stark Law and AKS, that is certainly relevant in determining whether GCS acted with "deliberate ignorance" or "reckless disregard" as to whether its referrals violated those statutes.

On the other hand, if GCS contends that it **did** believe the arrangements complied with the Stark Law and AKS, Relators would certainly be entitled to question the factual basis for this alleged belief, including any information it might have received from counsel. The Eleventh Circuit has made it clear that, when a party asserts that it affirmatively believed it complied with the law, that places the advice of counsel at issue. *See Cox v. Administrator, U.S. Steel & Carnegie*, 17 F. 3d 1386, 1419 (11th Cir. 1994) ("Similarly, in the present case, USX could have denied criminal intent without affirmatively asserting that it believed that its change in pension fund policy was legal. Having gone beyond mere denial,

affirmatively to assert good faith, USX injected the issue of its knowledge of the law into the case and thereby waived the attorney-client privilege.").

This principle has routinely been applied by courts in this circuit, including in the context of the False Claims Act. *See United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc*., 2014 U.S. Dist. LEXIS 188030, *6 (N.D. Ga. Feb. 21, 2014) ("To allow Fresenius to argue its good faith belief that its conduct was legal, but deny the Relator an opportunity to fully explore Fresenius's belief, would prejudice the Relator and thus be manifestly unfair. *See Cox*, 17 F.3d at 1417-18. Fresenius's affirmative reliance on its belief during all relevant times that its conduct was legal is thus sufficient to waive the attorney-client privilege."); *Barker v. Columbus Reg'l Healthcare Sys*., 2014 U.S. Dist. LEXIS 120504, *6-7 (M.D. Ga. Aug. 29, 2014) ("In *Cox*, the Eleventh Circuit held that when a defendant affirmatively asserts a good faith belief that its conduct was lawful, it injects the issue of its knowledge of the law into the case and thereby waives the attorney-client privilege…. Columbus Regional clearly intends to assert affirmatively that it had a good faith belief that it complied with the Anti-Kickback Statute, the Stark Law, and the False Claims Act.   Thus, Columbus Regional injected its belief as to the lawfulness of its conduct into the case and waived its attorney-client privilege as to communications relating to the legality of the

transactions that form the basis of Plaintiff's claims."); *United States v. Davita, Inc.*, 2014 U.S. Dist. LEXIS 187864, *4 (N.D. Ga. May 15, 2014) ("It is well-established that when a party asserts a defense of good faith belief in the accuracy of its claims or the legality of its actions, that defense generally waives any privilege that would otherwise protect attorney-client communications on that same subject matter.").

Although GCS asserts that it "is not relying on an advice of counsel defense," that is not responsive to the interrogatory, and is irrelevant to whether it has placed the advice of counsel at issue. *See Cox, supra* at 1419 ("The defendant need not raise an affirmative defense to inject a new issue into the case, although it frequently occurs that way."); *Saldivar, supra* ("That Fresenius maintains it will not rely on an advice of counsel defense does not change the analysis.").

In communications with Relators' counsel, GCS's counsel has attempted to justify its non-response by noting that the attorney-client privilege is only waived when a party affirmatively places the advice of counsel at issue. But that is precisely what the interrogatory is designed to determine – i.e., whether GCS is affirmatively placing its belief in the legality of the arrangements, and hence the advice of counsel, at issue by contending that it believed the arrangements complied with the law. GCS can answer the interrogatory "no," and that would not

place the advice of counsel at issue.[2]   However, Relators are entitled to know one way or the other, and GCS cannot simply refuse to answer the interrogatory while at the same time asserting attorney-client privilege with respect to communications with counsel.

Moreover, it appears that GCS **does** intend to place its belief in the legality of the arrangements at issue in this case.  Dr. Wendy Hawke Lenz was Chief Operating Officer ("COO") of GCS during the relevant period, and signed each of the contracts on behalf of GCS.  As COO, she had responsibility for compliance issues.  Lenz Dep., p. 43-45.  During her deposition, Dr. Lenz was directly asked whether, at the time she executed the various contracts, she believed that they

---

[2] Of course, if GCS answers the interrogatory "no," Relators would be entitled to an order in limine preventing GCS from relying on evidence that it believed its conduct was legal.  *See Arista Records LLC v. Lime Group LLC*, 2011 U.S. Dist. LEXIS 42881, *12 (S.D.N.Y. Apr. 14, 2011) (precluding defendants from "offering evidence or argument at trial regarding their purported belief in the lawfulness of their conduct" where they had blocked Plaintiffs from discovering communications with counsel); *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 2012 U.S. Dist. LEXIS 188149, *10-12 (C.D. Cal. Mar. 9, 2012) (excluding from trial any evidence or argument relating to good faith due to assertion of privilege during discovery); *Columbia Pictures Indus. v. Krypton Broad. of Birmingham, Inc*., 259 F.3d 1186, 1196 (9th Cir. 2001) (upholding district court's order prohibiting reliance on counsel at trial, where party "refus[ed] to answer questions regarding relevant communications with counsel until the 'eleventh hour'"); *E.G.L. Gem Lab, LTD. v. Gem Quality Inst., Inc*., 90 F. Supp. 2d 277, 296 (S.D.N.Y. 2000) ("Having blocked his adversary from conducting discovery on this issue, he will not now be heard to advance reliance on counsel).

complied with the Stark Law and Anti-Kickback Statute.  Without objection from

GCS counsel, she answered yes.  Lenz Dep., p. 257-258.[3]  When asked the basis

for this belief, she stated that "my basis was basically reliance on [other] people,"

and specifically referenced Reid Pearlman, an in-house attorney for GCS, stating

that "he was brought on board in 2008 to specifically review contracts, to house

and archive contracts, and to assure that Georgia Cancer Specialists was acting in a

way that was compliant from his standpoint."  *Id*., p. 258, 260; *see also id*., p. 226.

She also relied upon the fact that "[w]e had a compliance/risk management person,

Bob Palermo, that -- whose job was to review what relationships were."  *Id*. at 260.

After stating her reliance on these persons, she noted, as a basis for her belief in the

legality of the contracts, that she did not "recall anyone, over 15 years from the

resources that I relied on, tell me that these contracts were in violation of any fair

market value, Stark Law or Anti-Kickback."  *Id*.

---

[3] It was revealed during the deposition that GCS was paying for Dr. Lenz's lawyer
under a common interest agreement, and GCS repeatedly objected to questioning
regarding conversations between Dr. Lenz and GCS on the basis of a common
interest privilege.  Lenz Dep., p. 12-13, 17-18, 21.  Given the degree of
coordination between GCS and Dr. Lenz, it would be disingenuous for GCS to
suggest that it does not rely on Dr. Lenz's testimony in defense of this lawsuit.  In
any event, this demonstrates why it is necessary for GCS to respond to the
interrogatory by declaring whether it contends it had a good faith belief that it
complied with the Stark Law and AKS.

The Eleventh Circuit has made it clear that a party cannot contend that it believed its conduct complied with the law while simultaneously concealing attorney-client communications.  Moreover, a party cannot suggest that it believed it was acting lawfully because lawyers were involved in the process, while simultaneously refusing to reveal what counsel actually said.  *See Dorr-Oliver, Inc. v. FluidQuip, Inc.,* 834 F. Supp. 1008, 1012 (N.D. Ill. 1993) ("Defendants cannot have it both ways; they cannot seek refuge in consultation with counsel as evidence of their good faith yet prevent Dorr-Oliver from discovering the contents of the communication."); *Dunford v. Am. DataBank, LLC,* 2014 U.S. Dist. LEXIS 111761, *42-43 (N.D. Cal. Aug. 12, 2014) ("An often-used gimmick in litigation is to refer to having used outside counsel to foster the impression that an accused wrongdoer was acting in good faith based on the advice of counsel - without waiving the privilege to allow the other side to learn the actual advice given and whether the party actually relied on it.").[4]

---

[4] *See also In re Broadcom Corp. Securities Litigation,* Case No. SA-CV-01-275 (C.D. Calif. Feb. 10, 2005), p. 4-5 (attached as Exhibit 12) ("In effect, defendants are saying they relied on their excellent attorney to do a good job examining all the documents to tell them if anything was wrong, and their lawyers never said anything was wrong, with the unmistakable inference defendants felt assured the lawyers thought everything was legal.  Plaintiffs are now entitled to review the attorneys' communications on the subject topics to see if defendants are telling the truth."); *Van Straaten v. Shell Oil Prods. Co. LLC,* 2010 U.S. Dist. LEXIS 98604, *15-16 (N.D. Ill. June 8, 2010) ("Allowing Defendants to make the naked assertion

GCS is perfectly entitled to answer "no" to Interrogatory No. 8, although Relators would then be entitled to an order in limine preventing GCS from attempting to rely on its supposed belief in the legality of its actions, or the role played by counsel, as supporting a conclusion that it did not act "knowingly." However, Relators are entitled to know one way or the other, and GCS must be required to give a full and complete answer to the interrogatory.

3.      **Request for Production No. 14.**

Request for Production No. 14 is directly tied to Interrogatory No. 8, stating as follows:

> If you responded in the affirmative to Interrogatory No. 8 of Relators' First Interrogatories, please produce all documents evidencing communications with counsel relating to the Arrangements, and all documents you contend provide a basis for such good faith belief.

Exhibit 2, p. 9.  In response, GCS stated as follows: "GCS incorporates by reference its response and objections to Interrogatory No. 8 as its response to this

---

that they consulted with their attorneys would leave the fact finder with the impression that they had satisfied the aforementioned conditions even in situations where they had not. And if Defendants are permitted to create this impression while still maintaining their attorney-client privilege, they would effectively be abusing the privilege - using it as both a shield and a sword. This is not allowed."); *United States ex rel. Emanuele v. Medicor Associates, Inc.*, Case No. 1:10-cv-00245 (W.D. Pa. Oct. 15, 2014), p. 21 (attached as Exhibit 13) ("By referring to the 'role' played by counsel, a defendant … is necessarily implying that counsel did nothing to call the client's attention to any potential illegality, and the plaintiff is entitled to discovery to see whether this is true.").

request." Exhibit 4, p. 13.  On February 2, 2017, GCS produced a privilege log identifying some communications, although it is not clear whether this is log is intended to encompass documents that would be responsive to Request No. 14, or if it is a complete list of such documents.  *See* Exhibit 11.  Moreover, GCS has produced various documents with unexplained redactions.  *See* Exhibit 14.

As discussed above, it is black-letter law in the Eleventh Circuit that a party cannot contend that it believed an arrangement complied with the law while simultaneously shielding from discovery communications with counsel. Accordingly, unless GCS disclaims any contention that it had a good faith belief that the arrangements complied with the Stark Law and Anti-Kickback Statute, it should be required to produce all documents responsive to Request No. 14.  Should GCS, after refusing for months to produce documents or provide information on the grounds of attorney-client privilege, assert a contention that results in a waiver of the privilege, Relators should be given a reasonable amount of time for follow-up discovery related to this issue.

## **Conclusion**

For the reasons discussed above, the Court should require GCS to provide full and complete responses to Interrogatory No. 8 and Request for Production No.

14, and, if applicable, should allow Relators a reasonable period of time following

production to conduct follow-up discovery on this issue.

This 13th day of March, 2017.[5]

Respectfully submitted,

/s/ G. Mark Simpson
G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
110 Habersham Drive, Suite 108
Fayetteville, GA 30214
(770) 371-5008
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

Louis J. Cohen
Louis J. Cohen
California Bar No. 123968
Louis J. Cohen, A Professional Corporation
28720 Roadside Drive, Suite 273
Agoura Hills, CA 91301
(818) 889-5777
(818) 991-6999 (fax)
louiscohen@msn.com
Attorneys for Plaintiffs-Relators

---

[5] Counsel certifies that movant has in good faith conferred with counsel for GCS in
an effort to obtain the above discovery without court action.  Counsel certifies that
the foregoing brief filed has been prepared using Times New Roman 14 point font
in accordance with Local Rule 5.1(C).

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have on this day filed a copy of the foregoing document using the Court's CM/ECF system, which will automatically send notice of such filing to counsel of record

This 13th day of March, 2017.

<u>G. Mark Simpson</u>