# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES *ex rel.*
NATALIE RAVEN *et al.,*

        Plaintiffs-Relators,

    v.

GEORGIA CANCER SPECIALISTS I,
P.C., *et al.*,

        Defendants.

CIVIL ACTION
NO. 1:11-CV-0994-CAP

## DEFENDANT GEORGIA CANCER SPECIALISTS I, P.C.'S
## RESPONSE IN OPPOSITION TO PLAINTIFFS-RELATORS' MOTION TO COMPEL

Defendant Georgia Cancer Specialists I, P.C. ("GCS") files its Response in Opposition ("Response") to Plaintiffs-Relators Natalie Raven and Christy Curtis' ("Relators") Motion to Compel Response to Interrogatory No. 8 and Request for Production No. 14 and Brief in Support (Doc. 155; 155-1) (collectively, "Motion to Compel").

## I.    INTRODUCTION

The Court should deny Relators' Motion to Compel because (1) GCS has not affirmatively invoked, expressly or impliedly, and will not attempt to introduce evidence of, any attorney-client privileged communications for its

benefit at trial and, instead, relies on its layman's opinion that its conduct was appropriate under Stark Law and the Anti-Kickback Statute; (2) Relators have not demonstrated any prejudice resulting from GCS' invocation of the attorney-client privilege; and (3) Dr. Wendy Lenz, former Chief Operating Officer ("COO") of GCS, cannot waive GCS' attorney-client privilege.

Relators overstate the holdings found in *Cox v. Adm'r, U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994), and related precedent to apply to this case. Unlike *Cox*, GCS has not produced any attorney-client communications in this matter. In addition, GCS has affirmatively refuted that advice or communications with counsel played any role in its belief, at the time in question, that its conduct was appropriate. As a result, GCS has not attempted to use the privilege as both a sword and a shield, and the waiver analysis in *Cox* does not apply. In fact, a closer look at the facts of *Cox* shows that that case favors GCS' position.

Contrary to Relators' assertions, they have had a full and fair opportunity to conduct discovery into GCS' defense related to its belief and layman's understanding of the appropriateness of its agreements with Option Care HME, Inc. ("Option Care") and Amedisys, Inc. ("Amedisys"). GCS has stated that its understanding of the appropriateness of the contracts with

Option Care and Amedisys was not based on information protected by the attorney-client privilege but on a review of its own historical data. (GCS' Responses to Relators' First Set of Interrogatories ("Responses"), Doc. 155-5 at pp. 13-14, Ex. 3 to Motion to Compel). Dr. Lenz's testimony, while not relevant to the Court's waiver analysis, accords with GCS' stated understanding. Thus, GCS has not waived the privilege nor have Relators suffered any prejudice from GCS' assertion of the attorney-client privilege.

Relators inappropriately seek to force GCS to waive the attorney-client privilege notwithstanding the absence of an affirmative invocation of protected information. Furthermore, Relators overreach by attempting to preclude GCS from arguing lack of intent. In particular, Relators suggest that GCS must either waive the privilege or be precluded from asserting *any* belief that its conduct was appropriate under the circumstances even when that belief was *not* based on advice of counsel or privileged information. In essence, Relators improperly argue that GCS must waive the privilege or declare that it acted in bad faith.

*Cox* does not mandate waiver in every case where good faith appears nor does it prevent litigants from asserting a layman's understanding of the law without waiving the privilege. In reality, *Cox* prevents litigants from

using the privilege as a tool for offense. GCS has not done so in this case. For these reasons, the Court should deny Relators' Motion to Compel.

## II.    FACTUAL BACKGROUND

A detailed factual background is not required for the Court to complete its analysis of the Motion to Compel. However, Relators' briefing contains a number of factual inaccuracies, which GCS must correct.

GCS is a physician group that provides oncology and hematology services to its patients and is a national leader in advanced cancer research and treatment. (*See* Doc. 155-12, p. 1, Ex. 10 to Motion to Compel). On or about 1999, GCS and Option Care entered into an arrangement whereby Option Care personnel provided homecare coordination services for GCS' patients when a GCS physician determined that the patient needed certain follow-up home health (including durable medical equipment ("DME"), skilled nursing, and therapy services) or institutional (hospice) services. (Doc. 155-1, p. 2). Prior to this arrangement, GCS had a similar relationship with an entity called Healthfield who was GCS' preferred provider for referrals for infusion (intravenous, or IV) services. (Deposition of Relator Christy Curtis ("Curtis Depo."), February 21, 2017, pp. 210:25 – 213:17, attached hereto as

Exhibit 1). However, GCS had become dissatisfied with Healthfield's quality of care for GCS' patients and, consequently, ended the arrangement. (*Id.*).

Soon after January 1, 2003, GCS and Option Care entered into written agreements covering the home care coordination service provided by Option Care.[1] (Deposition of Dr. Wendy Hawke Lenz ("Lenz Depo."), March 1, 2017, pp. 97-99, Ex. 5 to Motion to Compel). The Coordination Agreement, attached to the Motion to Compel as Ex. 7, established that Option Care processed and managed, as part of its routine and normal business, referrals to Option Care for "home care services" or home health services. (Doc. 155-9, Ex. 7, at p. 2). These services were provided to all referral sources without charge. (Curtis Depo., p. 106: 2-15). Under the Coordination Agreement, Option Care agreed to provide home care coordination services to GCS even when the ordered referral service was not ultimately provided by Option Care. Coordination of

---

[1]     GCS objects to Relators' factual description contained in the Motion to Compel to the extent that Relators cite to any facts prior to the running of the statute of limitations, March 29, 2005, for any purpose other than establishing background information. In particular, any reference to the First Term Agreement (Motion to Compel at p. 3), the calculation of amounts owed under that agreement by either GCS or Option Care, and any information regarding the payments made thereafter are irrelevant to this case, which was limited by the Court to allegations that GCS caused false claims to be submitted to the Government for payment on or after March 29, 2005. (*See* Doc. 120, April 1, 2016 Order on Defendants' Motions to Dismiss). In addition, Relators inaccurately state that the First Term Agreement governed the parties' arrangement from 1999-2012 (which is actually 1999-2002). (*Compare* Motion to Compel at p. 3; 4).

non-Option Care referrals was an additional service that Option Care did not provide on a regular basis to other referral sources. Per the Agreement, GCS would pay Option Care the lesser of $12.50 per referral or a total of $1,334[2] per month for referrals for which Option Care did not provide the ordered home health service or could not provide the ordered institutional service. (Doc. 155-9, Ex. 7, pp. 2-4). The amounts were determined based on the parties' assumption of the amount of time it took process a non-Option Care referral and the typical volume of total referrals. (30(b)(6) Deposition of Georgia Cancer Specialists I, P.C., Alaa-El-Din Soltan, M.D., March 14, 2017, ("Soltan Depo."), attached hereto as Exhibit 3, pp. 77:1 – 79:2).

Also, as part of the Coordination Agreement, Option Care agreed to provide "pump call" (*see* definition contained in the Motion to Compel, p. 3) coverage from 5:00 p.m. to 8:30 a.m. Monday through Thursday. Option Care already required and paid its nurses to cover "pump call" during this time period as part of its infusion services to its patients. (Curtis Depo., at pp. 135:24 – 136:3). In exchange for each call handled by Option Care, where

---

[2]    GCS objects to Relators' reference to a net payment of $1,184 under the Coordination Agreement to the extent that the Relators suggest that a net calculation is appropriate for determining fair market value. Relators have not established, through expert testimony or otherwise, any support for this proposition. (*See* Motion to Compel at p. 5).

Option Care had not provided the infusion service, GCS agreed to pay $20 per call up to $40 per night. (Doc. 155-9, p. 5, Ex. 7 to Motion to Compel). In other words, GCS paid Option Care each time a patient called regarding a GCS infusion pump; Option Care had nurses on call and would not charge for calls regarding its own pumps.

On or about February 2008, Option Care terminated the arrangement with GCS. (Motion to Compel, at p. 6). Subsequently, Amedisys and GCS entered into a similar agreement whereby Amedisys agreed to provide, and GCS agreed to pay for, homecare coordination services. (Administrative Service Agreement ("ASA"), Doc. 155-10, p. 1, Ex. 8 to Motion to Compel). The written agreement, the ASA, stated that Amedisys "presently employs a liaison to assist GCS with the establishment of home health services with [Amedisys]." (*Id.*). Just like the Coordination Agreement with Option Care, under the ASA, GCS was obligated to pay for homecare coordination services only when another provider, not Amedisys, received the referral. (*Id.*).

Under the ASA, GCS agreed to pay $800 per month on a quarterly basis.[3] From April 2008 to December 2009, Amedisys neglected to send

---

[3]    The coordinator for Amedisys, unlike the arrangement with Option Care, was not obligated to process referrals for institutional, or hospice, services.

invoices to GCS pursuant to the terms of the ASA. (Lenz Depo., at p. 217:15 – 22). GCS' finance department would not pay a bill without receiving an invoice. (*Id.* at pp. 217:24 – 218:1). From February 2011 to March 2012, Amedisys, again, neglected to send invoices to GCS. (Doc. 155-12 at p. 4, Ex. 10 to Motion to Compel). Ultimately, the invoices were sent and paid by GCS. (Lenz Depo., at pp. 224:9 – 225:5; GCS' Response to Relators' First Set of Interrogatories, Doc. 155-5 at pp. 5-7, Ex. 3 to Motion to Compel).

On May 9, 2012 Amedisys [4] submitted a voluntary disclosure (the "Voluntary Disclosure") to the Centers for Medicare and Medicaid Services. In its Voluntary Disclosure, Amedisys assumed that, based on its internal documentation of the number of referrals from GCS, 54% of the coordinator of homecare services work was coordinating referral services that Amedisys did not provide, and 46% of the coordinator's work was processing referrals that Amedisys would keep. (Doc. 155-12 at p. 4, ¶¶ 4-5, Ex. 10 to Motion to Compel). Based on this assumption, which purportedly differed from the ASA's contractual allocation that the parties believed 20% of the coordinator's time would be spent on referrals that went to providers other than Amedisys, Amedisys determined "the compensation contracted for and

---

[4]    For purposes of this brief, GCS refers to Amedisys, Inc. and Amedisys Georgia, LLC as "Amedisys."

paid *may have been* less than fair market value for the services actually provided….” (*Id.* at p. 6) (emphasis added). Amedisys also stated that it never informed GCS that it was potentially furnishing more than 20% of the coordinator's time to handle GCS referrals until on or about April 13, 2012. (*Id.*). In addition, Amedisys declared “to the extent of any Stark Law noncompliance … the compliance shortcomings are attributable solely to Amedisys Georgia, and are not attributable in any way to any action or omission of GCS.” (*Id.* at p. 2).

## III.  LAW & ANALYSIS

Relators assert that they are entitled to know what GCS’ contentions are in this litigation. (Motion to Compel, p. 10).  Accordingly, Relators moved for an order compelling GCS to respond to Relators’ Interrogatory No. 8 and Request for Production of Documents No. 14. Interrogatory No. 8 asks GCS to indicate whether it “had a good faith belief that the Arrangement [with Option Care or Amedisys] complied with Stark Law or the Anti-Kickback Statute, and if so, state the factual basis for such belief, including:

> (i) whether such belief was based in whole or in part on the advice of, or communications with any counsel, consultant, or other adviser,

(ii) whether you sought or received any advice or opinions from any counsel, consultant, or other adviser with respect to such compliance, and

(iii) identifying any such counsel, consultant, or other adviser."

GCS objected to the Interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or work product doctrine and that it seeks a legal conclusion. Subject to those objections, GCS answered that GCS' payments to Option Care and Amedisys "were determined in good faith, based on historical data…." (GCS' Responses and Objections to Relators' First Set of Interrogatories, Doc. 155-5, pp. 14-15, Ex. 3 to Motion to Compel).

Despite the impropriety of Relators' request for information, which attempts to elicit a legal conclusion, to pierce the attorney-client privilege *sua sponte,* and essentially seeks to prohibit GCS from denying intent, GCS answered the Interrogatory denying any reliance on the advice-of-counsel defense and without alluding to or referencing any facts suggesting that advice of counsel impacted its belief. (*Id.*). In response to Request for Production No. 14, GCS did not produce any attorney-client privileged material. Moreover, Relators had the opportunity to explore GCS' positions at length during the deposition of Dr. Al Soltan, GCS' 30(b)(6) representative. Now,

under the guise that GCS did not respond to the Interrogatory, Relators seek an order from the Court that requires GCS to divulge communications subject to the privilege even though GCS has not invoked any such information.[5]

GCS should not be required to respond further to the Interrogatory. Similarly, neither GCS' response to Interrogatory No. 8 nor its witnesses' testimony waived the attorney-client privilege. Thus, with regard to GCS' response to Request for Production No. 14, GCS should not be required to produce any documents identified on its privilege log.[6]

---

[5]     GCS acknowledges that Relators ask the Court to order GCS to respond "Yes" or "No" to the Interrogatory. However, the question is simply a pretext for finding waiver of the privilege. If ordered to respond, GCS should be entitled to contend that it a good faith belief based on a layman's understanding of Stark Law and the Anti-Kickback Statute that the arrangements were appropriate.

[6]     Relators appropriately do not seek attorney work product, but attorney-client communications only. Work product remains protected except in certain extraordinary circumstances, which are inapplicable here. *See Maplewood Partners, L.P. v. Indian Harbor Ins. Co.*, No. 08-23343-CIV, 2011 WL 3918597, at *7 (S.D. Fla. Sept. 6, 2011) ("The court in *Cox* held that the doctrine of at-issue waiver 'does not extend to materials protected by the opinion work product privilege.' However, the Eleventh Circuit carefully limited its holding in *Cox* by specifying the circumstances where this limitation on at-issue waiver applies. The court stated that '[w]here a party asserts that he believed his actions to be lawful, he waives the attorney-client privilege as to what his attorney told him about the legality of his actions; his attorney's work product, however, is a different matter.' *Cox*, 17 F.3d at 1423. In *Cox* the withheld documents pertained to an element of a party's defense based on the *client's* thoughts and mental impressions. Thus, *Cox* recognizes the protection of an attorney's opinion work product from at-issue

### A.    GCS Has Not Affirmatively Injected Attorney-Client Privileged Information into This Case.

"As the [attorney-client] privilege serves the interest of justice, it is worthy of maximum legal protection." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994) (citing *Haines v. Liggett Group Inc.*, 975 F.2d 81, 90 (3d Cir.1992)). "The great weight of authority holds that the attorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party." *Cox*, 17 F.3d at 1417 (citing *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989)). Therefore, the first prong of the waiver test is whether a party has placed information protected by the privilege at issue through some affirmative act for his own benefit, which GCS has not done.

Absent an express waiver of the privilege, courts have recognized implied waiver under three scenarios: "[(1)] when a client testifies concerning portions of the attorney-client communication, [(2)] when a client places the

---

waiver where the issue injected into the heart of the litigation is a client's own thoughts and mental impressions.") (internal citations omitted).

attorney-client relationship directly at issue, and [(3)] when a client asserts reliance on an attorney's advice as an element of a claim or defense." *Id.* (internal citations omitted). In *Cox*, the Eleventh Circuit expanded implied waiver to situations where a party "injects into the case an issue that in fairness requires an examination of otherwise protected communications." *Chick-fil-A v. ExxonMobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *8 (S.D. Fla. Nov. 10, 2009) (citing *Cox*, 17 F.3d at 1419).

The Eleventh Circuit stated that the doctrine of waiver reflects the position that the attorney-client privilege "was intended as a shield, not a sword." *Cox*, 17 F.3d at 1417. Stated differently, "[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *Id.* (internal citation omitted). In *Cox*, the court found that defendant USX could have denied criminal intent without affirmatively asserting that it believed that its conduct was legal. Having gone beyond mere denial, affirmatively asserting good faith, USX injected the issue of its knowledge of the law into the case and waived the attorney-client privilege. *Id.*

Relators claim that in response to Relators' questions posed to a third-party witness and former COO, Dr. Lenz, GCS has demonstrated that it

intends to rely on its good faith belief that its conduct complied with Stark Law and the Anti-Kickback Statute and, therefore, waived the privilege. Relators' interpretation goes beyond the holding in *Cox* and other cases on the subject.

Notwithstanding GCS' analysis below regarding Dr. Lenz' status as a former employee incapable of waiving GCS' privilege, the Second Circuit, in a case decided after *Cox*, has already disposed of Relators' hasty conclusion stating: "That is not the law. Forfeiture of this type is premised *on the unfairness to the adversary* of having to defend against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *John Doe Co. v. United States*, 350 F.3d 299, 304 (2d Cir. 2003), as amended (Nov. 25, 2003) (emphasis added). In *Doe*, the Government, relying on *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), argued essentially the same position as Relators. The Second Circuit was not convinced and distinguished that the rule is "more aptly described as one of forfeiture, rather than waiver." *Id.* at 302. It further explained that "in *Bilzerian*, because the legal advice the defendant *in fact* received might well have demonstrated the falsity of his claim to the jury about his belief, he could not fairly both assert testimony that *implicitly communicated his version of the legal advice he*

*received* and simultaneously withhold disclosure of the legal advice he actually received. But the reasoning of *Bilzerian* and the other pertinent authorities in no way suggests that, merely by telling the prosecutor that he believes he is innocent, a defendant or suspect forfeits his privileges." *Id.* at 304 (emphasis added).

In sum, *Doe* proscribes a party's use of actual attorney advice or the inference of attorney advice to support that party's assertion of good faith. GCS has not attempted to do this, and GCS' 30(b)(6) testimony disposes of any possible inference that counsel was involved in forming GCS' belief that the agreements in place were appropriate.

Furthermore, Relators' reliance on *Cox* is misplaced. Appellants' briefing in *Cox* reveals the underlying facts of the dispute, which support GCS' arguments. In particular*,* Defendant USX asserted as a defense that it knew and believed that its actions complied with the governing statute in that case. *Cox v. Adm'r, U.S. Steel & Carnegie*, 1992 WL 12136603 (C.A.11), 118-19 (Brief of the Plaintiff-Appellants), attached hereto as Exhibit 2. Additionally, USX voluntarily and selectively produced to plaintiffs various attorney-client communications and work-product documents in support of USX's defense that it acted in good faith. *Id.*

Not only is *Cox* distinguishable on those grounds alone — GCS produced no such documents — the decision highlights the flaw in Relators' Interrogatory. Where in *Cox* the court found that USX could have denied intent without affirmatively asserting its belief that its conduct was legal, GCS was not afforded such a luxury. The question as phrased purports to require GCS to waive the privilege or declare bad faith. Accordingly, GCS appropriately objected to the Interrogatory.

In each of the cases cited by Relators, with the exception of *Barker, ex rel. U.S. v. Columbus Reg'l Healthcare Sys., Inc.,* No. 4:12-CV-108 CDL, 2014 WL 4287744 (M.D. Ga. Aug. 29, 2014) and *United States v. Davita, Inc.*, 2014 U.S. Dist. Lexis 187864 (N.D. Ga. May 15, 2014),[7] a party has affirmatively implicated advice or consultation with counsel as an offensive measure and then attempted to shield certain information by asserting the privilege. *See United States v. Fresenius Med. Care Holdings, Inc*., No. 1:10-CV-1614-AT, 2014 WL 11517840, at *2 (N.D. Ga. Feb. 21, 2014) (defendant relied on testimony from counsel and advice from counsel to support its belief

---

[7]    The Third Circuit has declared that cases like *Barker* "are of dubious validity." *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 864. And *Davita*, which concerns a party's declaration that its conduct was reasonable, not legal, favors GCS, because GCS is relying on the fact that its conduct was "appropriate" based on a layman's understanding of the law.

that its conduct was legal); Motion to Compel at p. 16 (citing *Dorr-Oliver, Inc. v. FluidQuip, Inc.*, 834 F. Supp. 1008, 1012 (N.D. Ill. 1993); *Dunford v. Am. DataBank, LLC*, 2014 U.S. Dist. Lexis 111761, *42-43 (N.D. Cal. Aug, 12, 2014); *In re Broadcom Corp. Securities Litigation*, Case No. SA-CV-01-275, *3 (C.D. Calif. Feb. 10, 2005) (finding a party may waive when it raises the inference of reliance of counsel when that party declared that it relied in good faith on assumptions of others including lawyers); *United States, ex rel. Emanuele v. Medicor Assocs., Inc., et al.*, Case No. 1:10-CV-245 JFC, (W.D. Penn. Oct. 15. 2014) pp. 21-22, Ex. 13 to Motion to Compel ("By referring to the "role" played by counsel, a defendant, such as Hamot,[8] is necessarily implying that counsel did nothing to call the client's attention to any potential illegality, and the plaintiff is entitled to discover to see whether this is true.")).

Each of these cases implicitly recognizes the requirement that to waive, a party must introduce the attorney-client privilege into the case by explicit reference or implication of any blessing by counsel. In fact, cases decided after *Cox* have confronted this issue head-on. *See e.g.*, *Doe*, 350 F.3d 299; *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 864; *Emanuele*, Case No. 1:10-CV-245,

---

[8]     Hamot also referenced three attorney-client communications in its interrogatory responses.

at p. 9 ("[A]lthough a party is free to tell no story at all about the role played by counsel, it is not permitted to tell half the story, implying that counsel blessed the arrangement by silence while concealing evidence as to whether counsel really was silent").

Relators have not offered any evidence to show that GCS waived its privilege. GCS has not referenced or produced attorney-client information for its benefit. GCS has not alluded to the involvement of counsel to support its statement of good faith. GCS stated that it is not relying on an advice of counsel defense. (Responses, Doc. 155-5 at pp. 13-14, Ex. 3 to Motion to Compel). And, GCS has never implied that advice or communications with counsel impacted its belief that its conduct was appropriate. (Soltan Depo., attached hereto as Exhibit 3, pp. 96:15 – 100:19; 105:1 – 23). According to GCS' 30(b)(6) witness, GCS did not have counsel negotiate or review the contracts at issue at the time they were executed. (*Id*. at pp. 103:11 – 19; 106:24 – 107:4). As a result, GCS is "tell[ing] no story at all about the role played by counsel." *Id.* Therefore, the precedent cited by Relators does not control this case.

### B.    GCS' Responses Do Not Prejudice Relators

As seen above, the waiver-inquiry requires that Relators show that it would be "manifestly unfair" for GCS to "inject[] into the case an issue that in fairness requires an examination of otherwise protected communications." *Cox*, 17 F.3d at 1417. A court "cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant." *Id.* at 1418 (citing *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408, 415 (D. Del. 1992)). In reality, Relators have asserted no prejudice in their Motion to Compel. *Cox* makes clear that Relators' tactic is disfavored. *Id.* (holding that there was no waiver because there was no showing of prejudice by the plaintiffs).

Fairness does not dictate that, because GCS has refuted counsel's role in forming its belief that the arrangements were appropriate thereby dispelling any inference of attorney-client communications, GCS must waive and turn over privileged materials. It requires the opposite.

## C.    Dr. Wendy Lenz Cannot Waive GCS' Privilege

On March 1, 2017, Relators deposed Dr. Wendy Lenz, who served as Chief Operating Officer of GCS when the agreements with Option Care and Amedisys were in place. When asked questions regarding the Coordination

Agreement, Dr. Lenz discussed at length her personal understanding of the terms of that agreement. In particular, Relators' counsel asked Dr. Lenz whether the $12.50 per referral was fair market value, and she stated that it was and her understanding was derived from looking at GCS previous staffing, salaries, and percentage of time allocated to the coordination services. (Lenz Depo., at pp. 146:15 – 147:22, Ex. 5 to Motion to Compel). Relators counsel inquired whether Dr. Lenz believed, at the time that she executed the Coordination Agreement with Option Care and the ASA with Amedisys, that the agreements complied with Stark Law. She responded "Yes," explaining that she relied on other people and her general understanding of fair market value and the prohibition of receiving any remuneration in return for referrals. (*Id.* at pp. 257:17 – 258: 14).

Relators claim that Dr. Lenz specifically referenced Reid Pearlman, former counsel for GCS, in connection with her answer. Thus, Relators aver, Dr. Lenz waived GCS' privilege. However, Dr. Lenz never stated that she relied on Mr. Pearlman's advice with regard to her understanding of the law and her belief that GCS' conduct complied with it. At best, she indicated the potential that attorney-client communications may have occurred after the fall of 2008 when Mr. Pearlman joined GCS, which was after the agreements at

issue were executed. (Lenz Depo., at p. 37:14 – 25). But "merely reveal[ing] the fact of a communication with counsel without revealing the substance of that communication" does not support the conclusion that Dr. Lenz "ha[d] made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue." *See Synygy, Inc. v. ZS Assocs., Inc.*, No. CIV.A. 07-3536, 2013 WL 3914483, at *3 (E.D. Pa. July 29, 2013). Thus, Dr. Lenz's mention of Mr. Pearlman is of no moment.

More importantly, "[t]he attorney-client privilege belongs solely to the client, and the client may waive it, either expressly or by implication." *Cox*, 17 F.3d at 1417 (internal citation omitted). A former employee may not waive the privilege for a corporate client. *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (finding a former employee did not waive the privilege because "the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors. [W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." (internal citations omitted)).

Dr. Lenz cannot cause GCS to waive privilege. Dr. Lenz is not a party to this suit and does not control GCS' litigation strategy or assertion of

defenses. Even if she could waive GCS' privilege, she did not do so in response to questions from Relators' counsel. It was Relators who put the issue of potential communications with counsel at issue in the deposition, not GCS. *Chick-fil-A*, 2009 WL 3763032, at *10 (finding that the defendant was not using the privilege as a sword where the plaintiff raised the issue on its accord).[9] Therefore, no waiver occurred. Again, GCS has expressly refuted any reliance on advice from counsel as part of its case-in-chief dispelling any prejudice. Therefore, Dr. Lenz's response to Relators' questions did not invoke attorney-client communications nor was her testimony provoked by GCS for its own benefit. *Cox*, *supra* (waiver required an affirmative act for one's benefit).

**D.    If the Court Does Not Find Relators' Question to Be Improper and That GCS Has Waived the Privilege, an *In Camera* Inspection of Documents Is the Proper Remedy.**

Relators' Motion fails to show that GCS' Interrogatory Response or Dr. Lenz's testimony is grounds for waiver. However, if the Court does not agree that Relators' Interrogatory inappropriately seeks a legal conclusion or attorney-client communications (which GCS has not injected into this case),

---

[9]    *Chick-fil-A* further supports GCS' position that Interrogatory No. 8 is an improper question as Relators posed the question upon which they now rely to purportedly require GCS to waive the privilege or declare bad faith. GCS did not affirmatively take any action to implicate the privilege.

GCS, in the interest of economy, states that it will supplement its Response as follows: GCS had a good faith belief, based on its layman's understanding of the law, that the arrangements with Option Care and Amedisys and GCS' conduct under those arrangements were appropriate under Stark Law and the Anti-Kickback Statute; it did not seek out the advice of counsel when it entered into the arrangements in question; and its belief was not based on advice or information protected by the attorney-client privilege but on historical data.

The analysis above demonstrates why GCS' supplemental response does not waive the privilege. Although, even if the Court finds that GCS would waive the privilege with its supplement response, the only documents relevant to Relators' inquiry are those which tend to show advice of counsel that is inconsistent with GCS' stated belief. *See Emanuele*, Case No. 1:10-CV-245, at p. 9 (fairness requires that a party not be permitted to tell half the story while concealing evidence to disprove that story).

If the Court is inclined to grant the Motion to Compel, it should limit Relators' request for production to documents tending to refute GCS' good faith belief only. Moreover, instead of producing its privileged materials to Relators directly, GCS requests it be permitted to turn over responsive

documents to the Court for an *in camera* inspection so that the Court may determine which documents, if any, should be disclosed to Relators. GCS' proposal balances the interests of justice while upholding the integrity of the privilege.

## IV.    CONCLUSION

For the reasons stated above, the Court should deny Relators' Motion to Compel. If the Court should find that GCS has not fully responded to Relators' Interrogatory, GCS has foreshadowed its supplemental response. This response does not waive the privilege. Therefore, the Court need not order GCS to respond further to Relators' Request for Production of Documents No. 14.   In the alternative, if the Court finds that GCS must produce privileged material, the Court should require an *in camera* inspection to determine if fairness requires the disclosure of any documents to disprove GCS' belief that its conduct was appropriate.

Respectfully submitted this 27th day of March 2017.

/s/ Aaron M. Danzig
Aaron M. Danzig
(Ga. Bar No. 205151)
ARNALL GOLDEN GREGORY LLP
171 17th Street NW, Suite 2100
Atlanta, GA  30363
aaron.danzig@agg.com

Telephone:    (404) 873-8504
Facsimile:    (404) 873-8505


Jeremy P. Burnette
(Ga. Bar No. 142467)
POLSINELLI, P.C.
1335 Peachtree St. NE, Suite 500
Atlanta, GA 30309
jburnette@polsinelli.com
Telephone:   (404) 253-6059
Facsimile:   (404) 759-2946
*Attorneys for Defendant Georgia Cancer*
*Specialists I, P.C.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document filed with the Clerk of Court has been prepared in 14 point Times New Roman font in accordance with Local Rule 5.1(C).

Dated:  March 27, 2017.

/s/ Aaron M. Danzig
Aaron M. Danzig, Esq.

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2017, I filed a copy of the foregoing

document using the Court's ECF/CM system, which will automatically send notice

of such filing to counsel of record for all parties:

Benjamin Wayne Cheesbro
Christopher J. Huber
Daniel Zev Herbst
Dorothy Cornwell
Eric Dubelier
Gregory Mark Simpson
James P. Kelly (terminated)
James William Cobb (terminated)
Joseph Metro
Lawrence J. Myers
Louis J. Cohen
Stacey Forbes


I further certify that on March 27, 2017, I served a copy of the foregoing to

counsel for the State of Georgia by depositing a copy in the U.S. Mail, first class

postage prepaid, addressed as follows:

> Kevin Bradberry
> Assistant Attorney General
> Georgia Department of Law
> 40 Capitol Square SW
> Atlanta, GA  30334
> kbradberry@law.ga.gov


> /s/ Aaron M. Danzig
> Aaron M. Danzig, Esq.